## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| RASMUSSEN INSTRUMENTS, LLC,<br><br>        Plaintiff,<br><br>   v.<br><br>DEPUY SYNTHES PRODUCTS, INC.,<br>DEPUY SYNTHES SALES, INC., AND<br>MEDICAL DEVICE BUSINESS<br>SERVICES, INC.,<br>        Defendants. | C.A. No. 1:20-CV-11807-WGY<br><br>**JURY TRIAL DEMANDED** |

### FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Rasmussen Instruments, LLC, ("Plaintiff" or "Rasmussen Instruments") files this First Amended Complaint and demand for a jury trial seeking relief for patent infringement by Defendants DePuy Synthes Products, Inc., DePuy Synthes Sales, Inc., and Medical Device Business Services, Inc. (collectively, "Defendants" or "DePuy").  Plaintiff states and alleges the following:

### THE PARTIES

1.      This case is brought by Rasmussen Instruments, a limited liability company organized and existing under the laws of the state of Utah, with its principal place of business located at 5848 South Fashion Blvd., Suite 110, Bldg. 3, Salt Lake City, Utah 84107.

2.      Rasmussen Instruments was formed by Dr. Gary Lynn Rasmussen, an orthopedic surgeon based in Murray, Utah, with over 40 years of experience in reconstructive orthopedic surgery.  Dr. Rasmussen is the sole member and owner of Rasmussen Instruments, and is the named inventor of the patents asserted in this action, which he has assigned to Rasmussen Instruments.

3.     Dr. Rasmussen has devoted much of his career to developing groundbreaking advances in the field of reconstructive orthopedic surgery, including for knee arthroplasty (i.e., knee replacement) surgery.

4.     For some of his innovations in this field, Dr. Rasmussen has been awarded several patents, including patents for devices for guiding resection of a femur and tibia of a knee joint in preparation for installing femoral and tibial knee components in connection with knee arthroplasty surgery.  Dr. Rasmussen's insights and innovations have dramatically improved the knee arthroplasty process, not only facilitating the installation of femoral and tibial knee components in a partial or total knee replacement, but also patient outcomes.

5.     Those patented advances were shared with DePuy, a large medical device conglomerate, which, on information and belief, despite knowing full well of Dr. Rasmussen's patents, recognized the many benefits of his patented innovations and used them without his permission or compensation.

6.     On information and belief, Defendant DePuy Synthes Products, Inc. ("DSP") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 325 Paramount Drive, Raynham, Massachusetts 02767.

7.     On information and belief, Defendant DePuy Synthes Sales, Inc. ("DSS") is a corporation organized and existing under the laws of the State of Massachusetts, with a principal place of business located at 325 Paramount Drive, Raynham, Massachusetts 02767.  On information and belief, DSS has done business under the name "DePuy Synthes Joint Reconstruction."

8.     On information and belief, Defendant Medical Device Business Services, Inc. ("MDBS") is a corporation organized and existing under the laws of the State of Indiana, with a

principal place of business located at 700 Orthopedic Drive, Warsaw, Indiana 46581.  On

information and belief, MDBS was formerly known as DePuy Orthopaedics, Inc.  On

information and belief, Defendants DSS and DSP are wholly-owned subsidiaries of MDBS.

9.      On information and belief, DePuy developed, makes, uses, and sells knee

arthroplasty products in the United States, including its "ATTUNE® Knee System."

10.      The Attune Knee System includes instruments, such as the Intuition Instruments

and its included Balanced Sizer, for use in connection with the implantation of the Attune Knee

System Family of Knee Implants.

## **THE ASSERTED PATENTS**

11.      On November 15, 2016, United States Patent No. 9,492,180 ("the '180 patent")

entitled "Arthroplasty Systems and Methods for Optimally Aligning and Tensioning a Knee

Prosthesis" was duly and legally issued by the United States Patent and Trademark Office.  Dr.

Rasmussen is its sole named inventor, and assigned the '180 patent, including the right to sue for

and collect past damages, to Plaintiff Rasmussen Instruments by an assignment recorded at

Reel/Frame 053920/0052, and Plaintiff Rasmussen Instruments accordingly owns all right, title,

and interest in and to the '180 patent.  A true and correct copy of the '180 patent is attached as

Exhibit 1.

12.      On December 31, 2019, United States Patent No. 10,517,583 ("the '583 patent")

entitled "Arthroplasty Systems and Methods for Optimally Aligning and Tensioning a Knee

Prosthesis" was duly and legally issued by the United States Patent and Trademark Office.  Dr.

Rasmussen is its sole named inventor, and assigned the '583 patent, including the right to sue for

and collect past damages, to Plaintiff Rasmussen Instruments by an assignment recorded at

Reel/Frame 053920/0052, and Plaintiff Rasmussen Instruments accordingly owns all right, title,

and interest in and to the '583 patent.  A true and correct copy of the '583 patent is attached as

Exhibit 2.  The '180 and '583 patents are collectively referred to as the "Asserted Patents."

## BACKGROUND

13.     During a knee replacement procedure, in which a damaged or diseased knee joint

is replaced with an implant, a surgeon reshapes the existing bone and cartilage so that the femur

and tibia fit the mating surfaces of the implant, or prosthesis.

14.     Dr. Rasmussen recognized that the manner in which the natural knee joint

performs is largely affected by the tension in the collateral ligaments of the knee, as well as by

the alignment of the articular surfaces of the knee joint relative to the collateral ligaments.

15.     He further recognized that in knee replacement procedures it is beneficial to

preserve the ligamentous and other soft tissue structures around the knee to provide a reference

point for accurately positioning the tibial and femoral components of the knee implant, with the

objective of preserving the original alignment of the knee joint so that the implant can flex and

extend in the same balanced and properly aligned manner as a natural joint.  Incorrect tension

balance and/or alignment can cause pain and/or discomfort and/or instability attributable to the

implanting of the knee prosthesis, and may necessitate additional corrective surgery.

16.     Dr. Rasmussen further recognized the benefits of instrumentation for guiding

resection of the femur, tibia and other structures in the knee during a knee arthroplasty that

works well with minimally invasive approaches to the tibia and femur.

17.     He further recognized the benefits of instrumentation that assists with the

balancing of forces between the knee implant components and the preserved ligamentous and

soft tissue structures for improved function of the knee implant.

18.     In particular, Dr. Rasmussen recognized the benefits of, and developed,

minimally-invasive or reduced-invasive instrumentation for guiding resection that uses the

4

ligamentous structure of the knee to guide placement of the instrumentation and the resulting

optimal alignment and physiological positioning of the knee prosthesis.  This not only improves

the arthroplasty procedure itself, but also patient outcomes.

19.     On February 8, 2005, Dr. Rasmussen filed U.S. Provisional Patent Application

No. 60/651,102 on his invention.  Several patents ultimately issued that claim priority to that

provisional application, including the Asserted Patents.  The Asserted Patents describe and

claim, *inter alia*, a device for maintaining the tension in the ligaments of a knee joint and/or

adjusting the alignment of a knee joint during knee replacement surgery.  The claims require,

*inter alia*, a "femoral component" or "elongated member," a "tibial component" or "tibial

contact member," and a "tensioning apparatus" or "threaded member" that moves the femoral

component and the tibial component with respect to each other.

20.     DePuy, including at least through DePuy Products, Inc. ("DPI"), a wholly-owned

subsidiary of MDBS, learned of Dr. Rasmussen's patented invention at least as early as 2009.

For example, DPI identified Dr. Rasmussen's patent publications claiming priority to his

Provisional Patent Application No. 60/651,102, during the prosecution of its own patent

applications starting as early as November 17, 2009.  *E.g.*, Exhibit 3 (November 17, 2009

Information Disclosure Statement during prosecution of the application that issued as DPI's U.S.

Patent No. 8,226,658).

21.     In September 2012, Dr. Rasmussen met with Manish Gupta, Group Product

Director of Knee Marketing for DePuy Orthopaedics, Inc. (now Defendant MDBS), in Salt Lake

City.  During that meeting, Dr. Rasmussen gave a presentation describing his patented invention,

with the goal of licensing his intellectual property to DePuy.

22.     In October 2012, Dr. Rasmussen provided Mr. Gupta and other representatives of DePuy with a copy of that same presentation.  Mr. Gupta then forwarded a copy of Dr. Rasmussen's presentation to DePuy's instrument team.

23.     From late 2012 until early 2014, Dr. Rasmussen was in contact with DePuy seeking to license his intellectual property.  Over that time, Dr. Rasmussen met with several representatives of DePuy on multiple occasions to discuss and demonstrate his invention.

24.     For example, in July 2013, Dr. Rasmussen provided Sarah Shupe, International Marketing Manager for Defendant DSS and John Naybour, World Wide Knee Marketing Director for MDBS parent company Johnson & Johnson, with copies of his then-issued patents claiming priority to his Provisional Patent Application No. 60/651,102.

25.     In August 2013, Dr. Rasmussen met with multiple representatives of DePuy in Warsaw, Indiana, including Ms. Shupe and Mr. Naybour, to discuss and demonstrate a prototype of his patented invention.

26.     In September 2013, Dr. Rasmussen attended an Advanced Surgical Process Panel Meeting in Toronto, hosted by DePuy Orthopaedics, Inc. (now MDBS), where he gave another presentation describing his patented invention.

27.     In January 2014, Dr. Rasmussen again met with representatives of DePuy, including Ms. Shupe and Mr. Naybour, in Salt Lake City to discuss his intellectual property.

28.     Dr. Rasmussen's licensing negotiations with DePuy ultimately broke down later in 2014, and no DePuy entity ever obtained a license to any of Dr. Rasmussen's patents.

29.     Even after licensing negotiations broke down, DePuy continued to identify Dr. Rasmussen's patent publications claiming priority to his Provisional Patent Application No. 60/651,102, during prosecution of their own patent applications.  *E.g.*, Exhibit 4 (October 26,

2015 Information Disclosure Statement during prosecution of the application that issued as DSP's U.S. Patent No. 10,117,699).

30.     In November 2014, Dr. Rasmussen filed an application claiming priority to his original 2005 provisional application, which ultimately issued as the '180 patent.

31.     Two years later, in November 2016, Dr. Rasmussen filed another application claiming priority to his original 2005 provisional application, which ultimately issued as the '583 patent.

32.     On information and belief, DePuy learned about the '180 and '583 patents shortly after they issued in November 2016 and December 2019, or was willfully blind to the existence of the patents.  In any event, DePuy became aware of the '180 and '583 patents no later than the date of filing of the original Complaint on October 2, 2020.

33.     On information and belief, since that time, DePuy has not taken any affirmative steps to avoid infringing the '180 or '583 patents.

## JURISDICTION AND VENUE

34.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

35.     This Court has personal jurisdiction over Defendants because they regularly conduct business in the Commonwealth of Massachusetts and therefore have substantial and continuous contacts within this judicial district; because they have purposefully availed themselves to the privileges of conducting business in this judicial district; and/or because they have committed acts of patent infringement in this judicial district.

36.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(b).

## COUNT I
### (Infringement of the '180 Patent)

37.     Plaintiff restates and realleges the preceding paragraphs of this Complaint.

38.     On information and belief, each of the DePuy Defendants has made, used, sold, offered for sale, and/or imported into the United States and is currently making, using, selling, offering for sale, and/or importing into the United States devices such as the Intuition Instruments Balanced Sizer, and components thereof, for the Attune Knee System (collectively, the "Accused Products").

39.     The Accused Products infringe one or more claims of the '180 patent.

40.     For example, the publicly available documents attached hereto as Exhibits 5-8 show that the Accused Products infringe at least claim 9 of the '180 patent.  The Accused Products include the Balanced Sizer, a device for adjusting the tension of ligaments in a knee joint.[1]



41.     The Accused Products include a femoral component defining an opening ("femoral component"), shown below, which Defendants refer to as a "Tapered Plug."  The

---

[1] *See, e.g.*, Ex. 5 at 34.

Tapered Plug is, for example, disposed on what Defendants refer to as an "IM Rod" or "Intramedullary Rod," shown below as Item 2 (e.g., DePuy Part No. 2544-00-510).[2]



INTUITION™ INSTRUMENTS – CASE 3
Femoral Sizing and Finishing

42.     As shown below, a portion of the femoral component and a portion of the opening are both configured to extend into a femur when the femoral component is seated at a distal portion of the femur.[3]



43.     The Accused Products also include a tibial component ("tibial component"), which Defendants refer to as a "Foot."  For example, two versions of the "Foot" are shown

---

[2] *See, e.g.*, Ex. 6 at 16.
[3] *See, e.g.*, Ex. 5 at 30.

below: the "CR Foot," Item 4 (e.g., DePuy Part No. 2544-00-523) and the "PS Foot," Item 5 (e.g., DePuy Part No. 2544-00-524).[4]



44.    The tibial component is configured to be seated at a proximal portion of a tibia, as shown below.[5]



45.    The Accused Products also include an elongated member ("elongated member"), which Defendants refer to as an "IM Rod," or "Intramedullary Rod," shown below as Item 2 (e.g., DePuy Part No. 2544-00-510).[6]

---

[4] *See, e.g.*, Ex. 6 at 16.
[5] *See, e.g.*, Ex. 5 at 34.
[6] *See, e.g.*, Ex. 6 at 16.

INTUITION™ INSTRUMENTS – CASE 3
Femoral Sizing and Finishing



46.     The elongated member is configured to extend into the opening in the femoral component, as shown below.[7]



47.     The Accused Products also include, *inter alia*, what Defendants refer to as a "Balanced Sizer Distractor," shown below as Item 7 (e.g., DePuy Part No. 2544-00-519).[8]

---

[7] *See, e.g.*, Ex. 5 at 30.
[8] *See, e.g.*, Ex. 6 at 16.

INTUITION™ INSTRUMENTS – CASE 3
Femoral Sizing and Finishing



48.    The Balanced Sizer Distractor includes a threaded member ("threaded member")

with female threads, as shown below.[9]



49.    The Balanced Sizer Distractor also includes another member, this one having

male threads, as shown below.[10]



---

[9] *See, e.g.*, Ex. 7.
[10] *See, e.g.*, Ex. 8.

50.     The female-threaded member ("threaded member") is configured to be coupled by the male-threaded member to the elongated member such that the threaded member is configured to be turned to vary tension in the knee joint by changing a distance between the femoral component and the tibial component, as shown below.[11]



51.     DePuy's infringement of the '180 patent has been both direct and indirect.

52.     On information and belief, each of the DePuy Defendants has directly infringed and is directly infringing the '180 patent under 35 U.S.C. § 271(a) because they have made, used, sold, offered for sale, and/or imported into the United States and are currently making, using, selling, offering for sale, and/or importing into the United States the Accused Products.

53.     On information and belief, one or more of the DePuy Defendants has and/or have indirectly infringed and continues to indirectly infringe the '180 patent under 35 U.S.C. § 271(b) because they have induced, and continue to induce, third parties (including medical entities such as hospitals and surgical centers, surgeons, physicians, medical professionals, and end-users of the Accused Products), to make and use the Accused Products.  Such making and usage by third parties constitutes direct infringement of at least claim 9 of the '180 patent.

---

[11] *See, e.g.*, Ex. 5 at 32, 34.

54.     For example, DePuy has supplied, and continues to supply, such third parties with instructions, documentation, tutorials, marketing materials and the like that instructed/instruct them how to make and use the Accused Products, with knowledge that making and usage in accordance with their instructions infringed/infringes the '180 patent, or with willful blindness to that fact.

55.     On information and belief, one or more of the DePuy Defendants has and/or have indirectly infringed and continues to indirectly infringe the '180 patent under 35 U.S.C. § 271(c) because they have contributed to direct infringement, and continue to contribute to direct infringement, by third parties (including medical entities such as hospitals and surgical centers, surgeons, physicians, medical professionals, and end-users of the Accused Products), of at least claim 9 of the '180 patent.

56.      For example, DePuy has sold, offered for sale, and/or imported into the United States and is currently selling, offering for sale, and/or importing into the United States various components of the Accused Products (including the IM Rod, CR Foot, PS Foot, Femoral Sizer, and Distractor) to these third parties with full knowledge of the '180 patent.  These third parties have assembled the components in order to make and use the Accused Products according to instructions, documentation, tutorials, marketing materials and the like that instructed/instruct them how to assemble and use the components of the Accused Products in ways that infringed/infringe the '180 patent.  DePuy's components were and are not staple articles or commodities of commerce suitable for substantial noninfringing uses.  Further, DePuy's components constituted/constitute a material part of the inventions claimed in the '180 patent. DePuy supplied/supplies these components with knowledge of the '180 patent and knowledge that the components were especially made for use in an infringing manner.

57.     On information and belief, one or more of the DePuy Defendants has and/or have also indirectly infringed and continues to indirectly infringe the '180 patent under 35 U.S.C. § 271(f)(1) and (2) by supplying in or from the United States, all or substantially all of the components of the Accused Products to third parties (including medical entities such as hospitals and surgical centers, surgeons, physicians, medical professionals, and end-users of the Accused Products), and actively inducing and intending these third parties to combine the components in a manner that would directly infringe at least claim 9 of the '180 patent if such combination occurred within the United States.

58.     For example, DePuy has supplied, and continues to supply, such third parties outside of the United States with all or substantially all of the components of the Accused Products (including the IM Rod, CR Foot, PS Foot, Femoral Sizer, and Distractor) with full knowledge of the '180 patent.  These third parties have made or used the Accused Products according to instructions, documentation, tutorials, marketing materials and the like that instructed/instruct them how to combine the components of the Accused Products and use them in ways that would infringe the '180 patent if such combination occurred within the United States.  DePuy provides these instructions to the third parties with the knowledge that assembly and usage in accordance with their instructions would infringe the '180 patent if such assembly and usage took place in the United States.  The components of the Accused Products constituted/constitute all or a substantial portion of the components of the inventions claimed in the '180 patent.  Further, DePuy's components are especially made and/or especially adapted for use in an infringing manner and DePuy's components were and are not staple articles or commodities of commerce suitable for substantial noninfringing uses.

59.     On information and belief, DePuy's actions demonstrate an intent not only to have caused the above acts that form the basis of direct infringement by third parties (or would form the basis of direct infringement if they occurred within the United States), but also that they caused these acts with the specific intent to infringe the '180 patent.  At a minimum, DePuy's conduct demonstrates that DePuy either knew or should have known that the acts of such third parties directly infringed/infringe the '180 patent (or would have infringed if those acts occurred within the United States).

60.     Moreover, on information and belief, DePuy's infringement of the '180 patent has been willful and merits enhanced damages.

61.     On information and belief, DePuy has no reasonable basis for believing that the claims of the '180 patent are either invalid or not infringed by the Accused Products.

62.     Plaintiff has been damaged as the result of DePuy's infringement, and DePuy's willful infringement in addition warrants an award of both enhanced and exceptional damages.

63.     On information and belief, DePuy has caused and will continue to cause Plaintiff irreparable injury and damage by infringing the '180 patent.  Plaintiff will suffer further irreparable injury and damage, for which it has no adequate remedy at law, unless and until DePuy is enjoined from infringing the '180 patent.

## COUNT II
### (Infringement of the '583 Patent)

64.     Plaintiff restates and realleges the preceding paragraphs of this Complaint.

65.     The Accused Products also infringe one or more claims of the '583 patent.

66.     For example, the publicly available documents attached hereto as Exhibits 5 and 6 show that the Accused Products infringe at least claim 7 of the '583 patent.  The Accused

Products include the Balanced Sizer, an apparatus for adjusting tension and an alignment of a knee joint.[12]



67.     The Accused Products include an elongated member ("elongated member"), which Defendants refer to as an "IM Rod," or "Intramedullary Rod," shown below as Item 2 (e.g., DePuy Part No. 2544-00-510).[13]



68.     The elongated member is configured to extend into the distal end of a femur, as shown below.[14]

---

[12] *See, e.g.*, Ex. 5 at 34.
[13] *See, e.g.*, Ex. 6 at 16.
[14] *See, e.g.*, Ex. 5 at 30.



69.     The Accused Products also include a tibial contact member ("tibial contact member"), which Defendants refer to as a "Foot."  For example, two versions of the "Foot" are shown below: the "CR Foot," Item 4 (e.g., DePuy Part No. 2544-00-523) and the "PS Foot," Item 5 (e.g., DePuy Part No. 2544-00-524).[15]



70.     The tibial contact member is configured to contact a proximal end of a tibia, as shown below.[16]

---

[15] *See, e.g.*, Ex. 6 at 16.
[16] *See, e.g.*, Ex. 5 at 34.



71.     The Accused Products also include, *inter alia*, what Defendants refer to as a "Balanced Sizer Distractor," shown below as Item 7 (e.g., DePuy Part No. 2544-00-519).[17]



72.     The Balanced Sizer Distractor is an adjustable component ("adjustable component") that connects the elongated member with the tibial contact member such that the tibial contact member is rotatable about a longitudinal axis of the elongated member when the apparatus is seated in the knee joint, when the elongated member is fixed in position with respect to the femur, and when the knee joint is in a flexed position, as shown below.[18]

---

[17] *See, e.g.*, Ex. 6 at 16.
[18] *See, e.g.*, Ex. 5 at 34-35.



73.     DePuy's infringement of the '583 patent has been both direct and indirect.

74.     On information and belief, each of the DePuy Defendants has directly infringed and is directly infringing the '583 patent under 35 U.S.C. § 271(a) because they have made, used, sold, offered for sale, and/or imported into the United States and are currently making, using, selling, offering for sale, and/or importing into the United States the Accused Products.

75.     On information and belief, one or more of the DePuy Defendants has and/or have indirectly infringed and continues to indirectly infringe the '583 patent under 35 U.S.C. § 271(b) because they have induced, and continue to induce, third parties (including medical entities such as hospitals and surgical centers, surgeons, physicians, medical professionals, and end-users of the Accused Products), to make and use the Accused Products.  Such making and usage by third parties constitutes direct infringement of at least claim 7 of the '583 patent.

76.     For example, DePuy has supplied, and continues to supply, such third parties with instructions, documentation, tutorials, marketing materials and the like that instructed/instruct them how to make and use the Accused Products, with knowledge that making and usage in

accordance with their instructions infringed/infringes the '583 patent, or with willful blindness to that fact.

77.     On information and belief, one or more of the DePuy Defendants has and/or have indirectly infringed and continues to indirectly infringe the '583 patent under 35 U.S.C. § 271(c) because they have contributed to direct infringement, and continue to contribute to direct infringement, by third parties (including medical entities such as hospitals and surgical centers, surgeons, physicians, medical professionals, and end-users of the Accused Products), of at least claim 7 of the '583 patent.

78.      For example, DePuy has sold, offered for sale, and/or imported into the United States and is currently selling, offering for sale, and/or importing into the United States various components of the Accused Products (including the IM Rod, CR Foot, PS Foot, Femoral Sizer, and Distractor) to these third parties with full knowledge of the '583 patent.  These third parties have assembled the components in order to make and use the Accused Products according to instructions, documentation, tutorials, marketing materials and the like that instructed/instruct them how to assemble the components of the Accused Products in ways that infringed/infringe the '583 patent.  DePuy's components were and are not staple articles or commodities of commerce suitable for substantial noninfringing uses.  Further, DePuy's components constituted/constitute a material part of the inventions claimed in the '583 patent.  Defendants have supplied/supply these components with knowledge of the '583 patent and knowledge that the components were especially made for use in an infringing manner.

79.     On information and belief, one or more of the DePuy Defendants has and/or have also indirectly infringed and continues to indirectly infringe the '583 patent under 35 U.S.C. § 271(f)(1) and (2) by supplying in or from the United States, all or substantially all of the

components of the Accused Products to third parties (including medical entities such as hospitals and surgical centers, surgeons, physicians, medical professionals, and end-users of the Accused Products), and intending and actively inducing these third parties to combine the components in a manner that would directly infringe at least claim 7 of the '583 patent if such combination occurred within the United States.

80.     For example, DePuy has supplied, and continues to supply, such third parties outside of the United States with all or substantially all of the components of the Accused Products (including the IM Rod, CR Foot, PS Foot, Femoral Sizer, and Distractor) with full knowledge of the '583 patent.  These third parties have made or used the Accused Products according to instructions, documentation, tutorials, marketing materials and the like that instructed/instruct them how to combine the components of the Accused Products and use them in ways that would infringe the '583 patent if such combination occurred within the United States.  DePuy provides these instructions to the third parties with the knowledge that assembly and usage in accordance with their instructions would infringe the '583 patent if such assembly and usage took place in the United States.  The components of the Accused Products constituted/constitute all or a substantial portion of the components of the inventions claimed in the '583 patent.  Further, DePuy's components are especially made and/or especially adapted for use in an infringing manner and DePuy's components were and are not staple articles or commodities of commerce suitable for substantial noninfringing uses.

81.     On information and belief, DePuy's actions demonstrate an intent not only to have caused the above acts that form the basis of direct infringement by third parties (or would form the basis of direct infringement if they occurred within the United States), but also that they caused these acts with the specific intent to infringe the '583 patent.  At a minimum, DePuy's

conduct demonstrates that DePuy either knew or should have known that the acts of such third parties directly infringed/infringe the '583 patent (or would have infringed if those acts occurred within the United States).

82.     Moreover, on information and belief, DePuy's infringement of the '583 patent has been willful and merits enhanced damages.

83.     On information and belief, DePuy has no reasonable basis for believing that the claims of the '583 patent are either invalid or not infringed by the Accused Products.

84.     Plaintiff has been damaged as the result of DePuy's infringement, and DePuy's willful infringement in addition warrants an award of both enhanced and exceptional damages.

85.     On information and belief, DePuy has caused and will continue to cause Plaintiff irreparable injury and damage by infringing the '583 patent.  Plaintiff will suffer further irreparable injury and damage, for which it has no adequate remedy at law, unless and until DePuy is enjoined from infringing the '583 patent.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Enter judgment that DePuy has infringed one or more claims of each of the Asserted Patents;

(2)     Enter an order permanently enjoining DePuy and their officers, agents, employees, attorneys, and all persons in active concert or participation with any of them, from infringing the Asserted Patents;

(3)     Award Plaintiff damages in an amount sufficient to compensate it for DePuy's infringement of the Asserted Patents, together with pre-judgment and post-judgment interest and costs, and all other damages permitted under 35 U.S.C. § 284;

(4)     Award Plaintiff an accounting for acts of infringement not presented at trial and an award by the Court of additional damage for any such acts of infringement;

(5)     Treble the damages awarded to Plaintiff under 35 U.S.C. § 284 by reason of DePuy's willful infringement of at least one claim of each of the Asserted Patents;

(6)     Declare this case to be "exceptional" under 35 U.S.C. § 285 and award Plaintiff all reasonable attorneys' fees, expenses, and costs incurred in this action; and

(7)     Award Plaintiff such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: January 28, 2021                         FISH & RICHARDSON P.C.


By: */s/ Kurt L. Glitzenstein*
      Kurt L. Glitzenstein (BBO #565312)
      Grant T. Rice (BBO #693430)
      Jacob B. Pecht (BBO # 699508)
      One Marina Park Drive
      Boston, MA 02210
      (617) 521-7042
      glitzenstein@fr.com
      rice@fr.com
      pecht@fr.com

      Jason M. Zucchi (*pro hac vice*)
      3200 RBC Plaza
      60 South Sixth Street
      Minneapolis, MN 55402
      (612) 335-5070
      zucchi@fr.com

      *Attorneys for Plaintiff*
      *Rasmussen Instruments, LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document(s) filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

on this 28th day of January, 2021.

/s/ *Kurt L. Glitzenstein*
Kurt L. Glitzenstein